UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 16-194 JGB (KKx)** | Date | May 23, 2017 |
|---|---|---|---|
| Title | ***Raul Uriarte-Limon v. Julissa L. Leyva et al.*** | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Findings of Fact and Conclusions of Law Re: Court trial  (In Chambers)

    This matter comes before the Court following a bench trial on March 21, 2017, on the issue of whether Julissa L. Leyva ("Leyva") owns, leases, or operates the parking lot in front of her restaurant, such that she may be held liable for its non-compliance under the Americans With Disabilities Act ("ADA").  After considering the Parties' arguments and the evidence introduced at trial, the Court finds and concludes as follows.

## I.    BACKGROUND

    Plaintiff initiated this action against Leyva on February 3, 2016 alleging violations of the ADA and California's Unruh Civil Rights Act ("UCRA") arising from his visit to the "Tamales & Tacos" restaurant in Rancho Cucamonga.  (Dkt. No. 1.)  On May 18, 2016, Plaintiff filed his First Amended Complaint, adding James Moffatt ("Moffatt") as a co-defendant. ("FAC," Dkt. No. 23.)  The FAC alleges that when Plaintiff, a paraplegic, patronized the restaurant, he observed that the restaurant lacked accessible parking, and that its transaction counter and restroom structure did not comply with ADA regulations.  (FAC ¶¶ 13-22.)[1]

    On December 13, 2016, this Court denied Plaintiff's motion for summary judgment against both Defendants, explaining that Plaintiff had failed to present any evidence indicating that either Moffatt—the former master lease holder for the restaurant—or Leyva—the current

---

    [1] However, Plaintiff seems to have abandoned his claims regarding non-compliant structures inside the restaurant; both his motion for summary judgment and his evidence at trial focused *only* on the defective parking accommodations.

owner of the restaurant—have (or ever had) control over the parking lot at issue. (Dkt. No. 44.) Subsequently, the Parties informed the Court that Plaintiff and Moffatt had reached a settlement. Accordingly, the case proceeded to trial only against Leyva, and only on the question of whether she was and is an owner, lessee, or operator of the parking lot at issue in this case. At trial, the Parties' evidence reaffirmed that all of the elements of an ADA claim had been met—except on this issue of ownership. Accordingly, following trial, the Parties submitted supplemental briefing on whether Levya can be held liable as an owner or operator, and whether she can be directed to carry out remedial changes to comply with the ADA. First, however, the Court makes findings of fact based on the trial testimony as follows.

Plaintiff has been disabled since July 2011 as the result of a spinal injury. He cannot walk, but uses a wheelchair for mobility. On February 5, 2011, he visited Tamales & Tacos in Rancho Cucamonga to buy tamales. The restaurant is located at 8111-B Foothill Boulevard in Rancho Cucamonga. The shopping strip in which the restaurant is located also contains a business called Red Hill Café. When he arrived, he discovered that the parking lot—which was connected to the restaurant, as well as to Red Hill Café—lacked a parking space that was marked and reserved for people with disabilities, or an access aisle that would allow him to assemble and disassemble his wheelchair upon entering and exiting his vehicle. This caused him discomfort. Plaintiff explained that, were the parking spot modified so as to comply with ADA guidelines, he would like to return to the restaurant.

At the time of Plaintiff's visit to the restaurant in February 2015, Leyva was the owner of the restaurant. The restaurant at that time only offered takeout services and operated out of one unit out of a four-unit space. Leyva had a month to month lease agreement with Moffat under which she rented out the one unit and he paid electricity, gas, and water bills. However, she understood from Moffat that she did not have authority to make structural changes to the parking lot. In late February or early March 2015, however, Leyva expanded the restaurant and rented out the remaining three units in the building. Around that time, Leyva asked Moffat about the parking lot, and he told her that he would take responsibility for adding the ADA-compliant striping and the required ramp. Also around that time—although the trial testimony left unclear the exact chronology—Leyva attempted to make changes to the parking lot, but was told by the city that she could not do so because she was not listed as an owner on a lease agreement. Specifically, Leyva explained that, because Moffat was the owner of the property and she was not listed on any leasing documents, the city indicated to her that she was not allowed to make any changes on the main parking lot.

Subsequently, Moffat—who seems to have held the master lease, although this was not expressly confirmed by the testimony—finished his lease and turned it over to Gabriella Sanchez ("Sanchez"). Sanchez, who held the master lease, then executed a new five-year sublease agreement with Leyva on March 1, 2015. This sublease agreement, which provides that Leyva, as sublessee, will rent out Suite B at 8111 Foothill Boulevard, does not make any reference to the parking lot. However, the lease contains the following provision:

> "Americans with Disabilities Act: In the event that as the result of Sublessee's use, of the Premises the Americans with Disabilities Act or any similar law requires modifications or the construction or installation of improvements in or to

the Premises, Project and/or Common Areas, the Parties agree that such modifications, construction or improvements shall be made at Sublessee's expense."

In any case, at some point after February 2015, a designated accessible parking space for persons with disabilities was installed. However, no tow-away signage was installed. As well, the access aisle was irregular in shape, measured only 35 inches at its narrowest points, and did not contain the words, "NO PARKING." There was no evidence as to who installed the parking space.[2] Independent contractor Cory Taylor, who provides investigative services for Plaintiff's counsel, confirmed that there is room in the parking lot for a 96-inch wide access aisle to be installed; specifically, he explained that simply moving the disabled parking stall one spot to the left would provide the necessary room for a 96-inch access aisle to its right.

Finally, Leyva's testimony at trial indicated that, although she was operating the restaurant as sole proprietor when Plaintiff visited in February 2015, she subsequently incorporated the business as a limited liability company. While the testimony on this point was somewhat muddled, it seems she began the process of incorporation sometime around January 2016 and completed it around March 2016. She is the sole member of the LLC.

## II.     CONCLUSIONS OF LAW

Title III of the ADA prohibits discrimination by places of public accommodations as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

Thus, to prevail on a discrimination claim under Title III, the Ninth Circuit has explained that a plaintiff must show that: "(1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his disability." Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc., 603 F.3d 666, 670 (9th Cir. 2010). The first element is not in dispute: as confirmed by the Court's findings of fact noted above, Plaintiff has sufficiently established that he is disabled within the meaning of the ADA. Neither is it in dispute that Plaintiff was denied public accommodations because of his disability. Specifically, ADA standards require a van-access aisle to be 96 inches wide to accommodate a wheelchair lift and must provide an additional sign that identifies the parking as "van accessible"; the parking spot at Tamales & Tacos did not—and still does not—comply with these requirements. However, for the reasons discussed below, it is not clear that Plaintiff has

---

[2] Leyva testified that she believed Moffat was responsible for painting the new access stripes on the parking space, but she could not be sure because they just appeared overnight.

satisfied the second element of the claim: the evidence at trial indicated that Leyva had *no* control over the parking lot on the date of Plaintiff's visit.

An individual may be personally liable for violations of the ADA only if he or she is the "operator" of a place of public accommodation where the discriminatory act occurred. Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 849 (9th Cir. 2004). An operator is one who has the ability to facilitate any necessary accommodation. Id. Moreover, the Ninth Circuit has explained that "a tenant's obligations as to ADA compliance are limited to those parts of the property that it controls" and that, absent a lease that explicitly gives a tenant control over the parking lot, "the landlord remains in full control of an entire property, as its owner." Kohler v. Bed Bath & Beyond of California, LLC, 780 F.3d 1260, 1264-65 (9th Cir. 2015). Plaintiff seeks to avoid the application of Kohler here by emphasizing that the landlord in that case exercised *exclusive* control over the parking lot. To this end, Plaintiff cites to Rodgers v. Claim Jumper Rest., LLC, No. 13-CV-5496 YGR, 2015 WL 1886708 (N.D. Cal. Apr. 24, 2015), in which a district court approved an ADA plaintiff's motion for fees, including for fees incurred while litigating whether the defendant had control over common areas in a shopping center. Specifically, Plaintiff contends that Rodgers stands for the proposition that tenants are responsible for common areas, such as parking lots. But Rodgers does not help it make this point: there, the court emphasized that what differentiated it from Kohler *was the procedural posture*, finding only that "it was not unreasonable for plaintiff to pursue claims over the common area while he was prosecuting his restaurant-specific claims, and Kohler does not squarely apply." 2015 WL 1886708, at *7. That it was not unreasonable for the plaintiff to litigate such claims does not amount to a holding that a tenant is responsible for ADA violations in common areas.

More importantly, the evidence adduced at trial indicated that, even if this *were* the holding of Rodgers, it would not apply here: Leyva's testimony confirmed that she did not have *any* control over the parking lot when Plaintiff visited the premises in February 2015. This was confirmed by two key portions of her testimony: 1) Moffatt informed her that he was responsible for the parking lot; and 2) when she attempted to make changes, she was denied permission by the city.[3] Thus, this case would seem to align with the facts in Kohler: the evidence indicated that Moffat—the master leaseholder—had exclusive control at the time of Plaintiff's visit.

But this is not the end of the inquiry, because the evidence also indicated that Leyva *gained* control of the parking lot on March 1, 2015—less than a month later—when she entered into a five-year lease with Sanchez. That lease expressly provides that modifications, construction, or improvements to the "Premises, Building, Project and/or Common Area" were to be made at Leyva's expense. Notably, the "Premises" are described in the lease as "8111 Foothill Blvd., Ste. B." This suggests that the remaining areas described in the ADA provision of the lease—like the "Common Area"—extended beyond the suite itself to areas such as the parking lot. Moreover, just as Leyva's testimony indicated that she was previously precluded from making changes to the parking lot because she was not on the lease, her testimony *also*

---

[3] The testimony was somewhat vague as to the specifics of Leyva's interactions with the city; however, the Court interpreted her testimony as indicating that she sought a building permit from the City of Rancho Cucamonga to modify the parking structure.

suggests that she would be permitted to make changes to the parking lot once she was on the lease—as she now is.

This raises two legal questions: first, whether Leyva may be held liable as the current owner for the previous owner's failure to make the parking lot accessible; and second, whether Leyva may be enjoined directly as the operator despite having incorporated as an LLC during the case—and despite the fact that the lease is between Sanchez and the Tamales & Tacos LLC. The Court addresses these in turn.

First, while the Ninth Circuit has not addressed the question whether a subsequent owner can be held liable for violations of Section 12182(a), a Northern District court reviewed the issue in <u>Hodges v. El Torito Restaurants, Inc.</u>, No. C-96-2242 VRW, 1998 WL 95398 (N.D. Cal. Feb. 23, 1998). There, the court answered the question in the affirmative, reasoning as follows:

> "[T]he court must determine whether the current owner of a building can be held liable for the previous owner's failure to make the restaurant accessible. El Torito argues that it cannot be held liable for the violations of El Caballo—the restaurant that previously occupied the building. While there is surprisingly little case law addressing this issue, the court concludes that El Torito's position cannot be an accurate assessment of the law. If courts were to adopt El Torito's position, businesses would be able to circumvent California's accessibility requirements through sham sales and transfers. Furthermore, businesses that chose not to comply with California's various accessibility requirement would not lose any resale value in their buildings. Surely, the legislature did not intend to enact such a self-eviscerating law.
>
> Indeed, the case at bar provides a good example of why El Torito's position must fail. If plaintiffs had to sue the now defunct El Caballo for violations that allegedly first appeared while El Caballo occupied the building, it is unlikely that plaintiffs could obtain money damages. Furthermore, because El Caballo no longer has control over the building, plaintiffs could not achieve the ultimate goal of the various state laws at issue—an accessible restaurant. It is therefore clear that the best way to effectuate the goals of California's accessibility laws is to hold the current owners of buildings liable for existing violations. El Torito may argue that it is unfair to hold it liable for the wrongs of the previous owner, but El Torito had the opportunity to address these issues when it purchased the building. Much like the situation with a non-latent defect or a cloud on title, El Torito had constructive notice of these violations . . . Such an approach is not uncommon within the law regarding successors in interest: companies assume the liabilities of other companies they acquire and land buyers assume responsibility for hazards on the real estate they purchase."

1998 WL 95398, at *3-4. The Court finds this reasoning persuasive to justify the imposition of liability given the facts at issue here. In making this determination, the Court notes also that it is consistent with the guidance provided by the Department of Justice, which explains that an entity has a "*continuing obligation* to remove barriers where it is readily achievable to do so." 28 C.F.R.

§ Pt. 36, App. A (emphasis added). The continuing obligation provision indicates that an entity may be liable where it has knowledge of a violation, control over the area in question, and yet fails to make a readily achievable correction.

The Court also notes that this rule is not inconsistent with the language of § 12188(a), which provides remedies "to any person who is being subjected to discrimination on the basis of disability in violation of [sections 12181 *et seq.*] or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 . . . " 42 U.S.C. § 12188(a)(1). Here, Plaintiff has indicated that he would return to Tamales & Tacos, but for the barriers to accessibility. Thus, he has established a continuing connection to the premises sufficient to claim injunctive relief from the entity currently failing to remove these barriers.[4] Accordingly, the Court concludes that holding a subsequent owner liable for noncompliant accommodations—at least where it is clear that she has had both notice and a reasonable time period within which to execute the necessary changes—in necessary to effectuate the directives of the ADA. Were the Court to find otherwise, Plaintiff would be left without recourse to challenge the ADA violations in question, since he could seek injunctive relief neither from Moffat nor Leyva.

The above discussion, however, skips over one additional wrinkle: namely, that the lease is between Sanchez and Tamales & Tacos, LLC, and not directly with Leyva. Thus, the Court reaches the second part of the inquiry: whether Leyva may be held individually liable where the lease does not directly name her as the tenant. On this question, the Ninth Circuit's discussion in Lentini v. California Ctr. for the Arts, Escondido, 370 F.3d 837 (9th Cir. 2004) is instructive. There, the court considered the defendant's argument that he—one of the directors of a center for performing arts—could not be held individually liable for the center's refusal to allow the plaintiff to bring her service dog to concerts. 370 F.3d at 840. In denying this argument, the court explained that Title III of the ADA prohibits discrimination by any person who operates a place of public accommodation; that "to operate" means "to put or keep in operation," "to control or direct the functioning of," or "to conduct the affairs of; manage"; and that the director could be held individually liabile under these guidelines because he was "in a position of authority" regarding decisions about ADA accommodations. Id. at 849. Courts in this Circuit have followed Lentini's lead to hold managerial or executive officers liable for ADA violations on premises owned by corporate entities. See Banga v. Kanios, No. 16-CV-04270-RS, 2016 WL 7230870, at *3 (N.D. Cal. Dec. 14, 2016) (individual defendants were operators in position to ensure nondiscrimination, and thus can be held individually liable under ADA); Moore v. Saniefar, No. 1:14-CV-01067-SKO, 2015 WL 3487066, at *4–5 (E.D. Cal. June 2, 2015) (finding restaurant managers individually liable for failure to accommodate under the ADA despite not being named as registered owners of the restaurant because they were

---

[4] In fact, this reasoning is strengthened by considering that, were Plaintiff to return to Tamales & Tacos today, he would easily be able to satisfy the elements of his ADA claim: it is undisputed that the parking space still falls short of satisfying the ADA standards, and the testimony sufficiently established that Leyva is the operator of the premises. Yet it would be unreasonable to require Plaintiff to return to the restaurant—*knowing* that the parking space remained out of compliance—for the sole purpose of allowing him to vindicate his claim.

personally responsible for management of the restaurant); Rodriguez v. Barrita, Inc., No. C 09-04057 RS, 2012 WL 3538014, at *15 (N.D. Cal. Mar. 1, 2012) (finding corporate partners individually liable as operators where there was evidence they controlled day-to-day operations on the property and did not observe formalities in board meetings); cf. Beadle v. Postal, No. CV 17-00049 JMS-KSC, 2017 WL 1731683, at *4 (D. Haw. May 2, 2017) (employees who "merely implement company-wide policies" cannot be personally liable under Title III of the ADA).

These cases makes clear that Leyva may be held individually liable here. Her testimony confirmed that she is the manager of the Tamales & Tacos restaurant, that she is the sole manager and member of the LLC, and that she is responsible for decisions involving alterations to the premises. Thus, she is a responsible party under the ADA and can be directed to comply with the ADA.

**B.    Plaintiff's Unruh Act claim**

In the disability context, California's Unruh Civil Rights Act operates virtually identically to the ADA.[5] Molski v. M.J. Cable, Inc., 481 F.3d 724, 731 (9th Cir. 2007). It states, "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). Any violation of the ADA necessarily constitutes a violation of the Unruh Act. Molski, 481 F.3d at 731. Because the Court has found Leyva liable for a violation of the ADA, she is also liable for a violation of the Unruh Act. See Love v. Garcia, No. 515CV02004CASSPX, 2017 WL 1838560, at *3 (C.D. Cal. May 5, 2017) ("Because, as discussed above, any violation of the ADA is also a violation of the Unruh Act, plaintiff has proven all of the elements of his Unruh Act claim.")

The Unruh Act allows for statutory and actual damages, as well as attorneys' fees. Cal. Civ. Code § 52. The litigant need not prove he suffered actual damages to recover the independent statutory damages. Botosan v. Paul McNally Realty, 216 F.3d 827, 835 (9th Cir. 2000). The Unruh Act establishes a presumptive minimum amount of statutory damages of $4,000 for each occasion wherein the plaintiff encountered a violation. Cal. Civ. Code § 52(a). Consequently, because Leyva has not shown that she falls within an exception to this presumption, she is liable to Plaintiff in the amount of $4,000, plus Plaintiff's reasonable attorneys' fees.

### III.    CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Levya discriminated against Plaintiff in violation of the ADA and Unruh Act by failing to adequately

---

[5] While the Unruh Act usually requires a showing of intentional discrimination, this requirement does not apply where an Unruh Act claim is premised on a violation of the ADA. See Lentini, 370 F.3d at 847 (9th Cir. 2004) ("[N]o showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation.")

provide accessible parking marked for the disabled. Leyva is liable to Plaintiff in the amount of $4,000 plus reasonable attorney's fees that have yet to be determined by the Court.

Plaintiff is ordered to prepare a judgment consistent with this Order to be filed with the Court no later than **May 31, 2017**. That order shall specify the nature of the injunctive relief required to bring the parking space at Tamales & Tacos into compliance with the ADA standards.

As well, no later than **June 9, 2017**, Plaintiff shall file a brief regarding his attorneys' fees. Said brief (or accompanying declaration) shall set forth, at a minimum, the number of hours reasonably expended by counsel, a general description of how those hours were expended and by whom, and counsel's associated hourly fees and qualifications. Leyva shall file any opposition or challenge to the amount of fees requested by plaintiff no later than **June 16, 2017**.

**IT IS SO ORDERED.**